UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
:
:
UNITED STATES OF AMERICA,                          :      22-CR-173 (ARR)
:
:      NOT FOR ELECTRONIC
      -versus-                                                :      OR PRINT PUBLICATION
:
KENYATTA GRIFFIN-BEY,                              :
:      **OPINION & ORDER**
                *Defendant*.                       :
:
------------------------------------------------------------------------ X

ROSS, United States District Judge:

Defendant, Kenyatta Griffin, is charged with multiple counts of bank robbery, in violation of 18 U.S.C. § 2113. He moves to suppress (1) a written note recovered from his pocket at the time of his arrest, and (2) statements made to police officers during a post-arrest interrogation. For the following reasons, I deny his motion to suppress the written note and grant his motion to suppress his post-arrest statements made following his invocation of his right to remain silent.

## BACKGROUND

*Search Incident to Arrest*

On March 6, 2022, NYPD Officers Ganshaw and Pawelic responded to a complaint that a man had engaged in unwanted sexual touching of a woman at a grocery store in Brooklyn, New York. The events that followed were recorded on Officer Ganshaw's body camera. Body Camera Footage of the Defendant's Arrest, Ex. A to Declaration of Michael D. Weil, ECF No. 20-1 (hereafter "Ex. A"). Officer Ganshaw interviewed the victim, who identified Mr. Griffin, standing nearby, as the man who had groped her. *Id.* 1:12. The officers approached Mr. Griffin and arrested him. *Id.* 1:30.

After placing Mr. Griffin under arrest and while putting him in handcuffs, Officer Ganshaw began to search Mr. Griffin's person. *Id.* 1:45. Officer Pawelic asked Mr. Griffin if he had any identification. Mr. Griffin did not provide his name or a valid identification. *Id.* 1:50. Officer Ganshaw continued his search, confiscating Mr. Griffin's cell phone and keys. *Id.* 2:42, 3:17.

The officers then moved Mr. Griffin to a police vehicle. *Id.* 4:00. Officer Ganshaw repeatedly asked Mr. Griffin for his name and Mr. Griffin refused to answer. *Id.* 4:00–4:30 Officer Ganshaw then searched Mr. Griffin's jacket pockets, finding a white piece of paper, folded in half, and blue synthetic gloves. *Id.* 4:54. Officer Ganshaw shoved both the paper and the gloves back into the pocket without further inspection. *Id.* 4:57. Officer Ganshaw again asked for the Mr. Griffin's name, and Mr. Griffin responded that his name was Todd. *Id.* 5:07. Mr. Griffin then provided his last name as "Griffin," but Officer Ganshaw, apparently having not heard, asked for the spelling of his last name. *Id.* 5:12. The officer repeatedly asked for Mr. Griffin's last name, but Mr. Griffin refused to provide it and asked for a lawyer. *Id.* 5:20–7:25. Officer Ganshaw left Mr. Griffin in the vehicle while the officer spoke with other witnesses and officers present on the scene. *Id.* 8:15.

Returning approximately four minutes later, Officer Ganshaw asked again for Mr. Griffin's last name. *Id.* 12:12. In response to multiple inquiries, Mr. Griffin replied, "Griffin." *Id.* 12:47. Mr. Griffin provided his date of birth and denied any previous arrests. *Id.* 12:53–13:19. As the officers were inquiring about Mr. Griffin's address, Officer Ganshaw pulled out the folded piece of paper from inside Mr. Griffin's previously-searched jacket pocket and opened it. *Id.* 14:08.

The paper contained a handwritten note, visible to the officer's body camera, which reads: "I HAVE A GUN! I WILL SHOOT Y-O-U! DON'T RISK YOUR LIFE! HAND ME CASH! 100'S – 50'S – 20'S NOW!!!! NO FUNNY BIZ! MOVE IT! GO!" *Id.* 14:18. Officer Ganshaw

2

seized the paper and transported Mr. Griffin to the precinct for processing. *Id.* 15:46.

*Post-Arrest Interrogation*

Following Mr. Griffin's arrest and upon his arrival at the precinct, two NYPD detectives, Detectives Park and Suarez, conducted a custodial interrogation. Video Recording of the Defendant's Post-Arrest Interrogation, Ex. B to Declaration of Michael D. Weil 8:40, ECF No. 20-1 (hereafter "Ex. B"). Detective Parks informed Mr. Griffin that they wanted to speak with him about four bank robberies. *Id.* 9:38. Mr. Griffin responded, "I'm not talking about something different than I thought" and "I mean, I don't even know what's going on." *Id.* 10:07–10:17. At that point, Detective Parks said, "I'm going to read the *Miranda* and then we'll continue talking." *Id.* 10:25. He then read Mr. Griffin his *Miranda* rights and asked Mr. Griffin to acknowledge that he understood each enumerated right, and Mr. Griffin stated he did. *Id.* 10:30–10:58. Detective Park resumed his questioning about the bank robberies, saying "Now that we've advised you of your rights, we're going to get down to the nitty gritty, ok. What were you about to say before I read you your rights? What did you want to talk about with us?" *Id.* 11:03. Mr. Griffin responded, "I don't have anything to say." *Id.* 11:17. Detective Parks asked Mr. Griffin if he wanted to know "what we got so you understand where you stand" and Mr. Griffin replied, "Sure." *Id.* 11:19–11:28. Detective Parks proceeded to detail evidence law enforcement had gathered concerning four robberies sharing similar characteristics, including demand notes used in three of those previous robberies with fingerprints matching Mr. Griffin's, as well as information from police officers in Phoenix, Arizona regarding similar robberies that occurred there in 2020. *Id.* 11:29–12:04.

The detectives asked Mr. Griffin what factors might have led to his arrest, such as any substance abuse issues or other problems. *Id.* 12:22. With additional prompting, Mr. Griffin spent

several minutes acknowledging various obstacles he has faced in recent years, including issues with substance abuse in the month prior to his arrest. *Id.* 13:11–16:03. The detectives stated that they would like to "go over each incident" with Mr. Griffin. *Id.* 16:14. Though he initially engaged with the detectives, and, when prompted, seemed to acknowledge that he remembered the location of the first robbery and what occurred there, he then stopped and asked for clarification: "What am I dealing with here?" *Id.* 16:30–17:30. Detective Parks detailed potential benefits of cooperating with law enforcement. *Id.* 17:39. The following exchange occurred:

> Mr. Griffin: Can I talk to a lawyer? Don't I have a right to a lawyer at least?
>
> Detective Parks: You absolutely have a right to it that's what we read you at first.
>
> Mr. Griffin: Let me talk to a lawyer, let him talk to y'all, I'll talk to a lawyer. How about that?
>
> Detective Parks: So you want to talk to him, would you talk to him and then talk to us, is that what you were going to do? Explain to me what would you want done.
>
> Mr. Griffin: You said yourself normal time.
>
> Detective Parks: Right, but here's the thing. If you zip it up now, right you will probably not … you know you don't get to say it in court yourself. This is like, I mean, this is the time. There is no other time. If you [inaudible] and say I'm good today, we take back what we got [inaudible] but then it's going to be all that forensic evidence piling on you. We don't want to pile on the [inaudible]. I don't want to do you hard. If you are reluctant I understand but I'm telling you straight. I got what I got. If you don't say nothing it actually works against you . . . .

*Id.* 19:33–20:45. Mr. Griffin subsequently admitted to all four robberies.

**DISCUSSION**

On September 2, 2022, Mr. Griffin moved to suppress the written note recovered from his pocket—alleging violation of the Fourth Amendment's protections against illegal searches—and the statements made to police detectives during his post-arrest interrogation—alleging violations of his Fifth Amendment rights. The government opposes.

The circumstances of the search incident to arrest are entirely evident from the body-camera footage recorded at the time of his arrest. Ex. A. The circumstances of the post-arrest interrogation are clear from a recorded video. Ex. B. Therefore, there is no factual dispute as to what transpired, and I may decide Mr. Griffin's motions without an evidentiary hearing. *See United States v. Harun*, 232 F.Supp.3d 282, 285 (E.D.N.Y. 2017).

**I.    Search Incident to Arrest**

Mr. Griffin seeks to suppress the written note recovered from his pocket at the time of his arrest as the fruit of an illegal search. He contends that the seizing, opening, and reading of the note in his pocket was unlawful in that it exceeded the scope of an authorized search incident to arrest, and therefore required a warrant. He does not dispute the lawfulness of the arrest.

The Fourth Amendment protects people from unreasonable searches and seizures. U.S. Const. amend. IV. A warrantless search is per se unreasonable unless the search falls into one of several "specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). "It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment." *United States v. Robinson*, 414 U.S. 218, 224 (1973).

The question before me, then, is whether the search incident to arrest exception validates the warrantless opening and reading of the note from Mr. Griffin's pocket. I find that it does. The

5

Supreme Court's decision in *Chimel v. California* laid the groundwork for the search incident to arrest doctrine. 395 U.S. 752 (1969). The Court set forth a rule for assessing the reasonableness of a search incident to arrest, namely that when an arrest is made, it is reasonable for the arresting officer to search the person arrested (1) for weapons, in order to ensure the officer's safety, and (2) for any evidence "in order to prevent its concealment or destruction." *Id.* at 762−63. In *United States v. Robinson*, the Court applied the *Chimel* framework, announcing a categorical rule regarding an officer's authority to conduct a search of the arrestee's person: where a lawful arrest occurs, police are authorized to conduct a full search of the arrestee's person and that search is not limited to a search for evidence related to the crime of arrest. 414 U.S. at 235 ("The authority to search the person incident to a lawful custodial arrest . . . does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found . . . . A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.").

In *Riley v. California*, however, the Court narrowed this categorical approach, declining to extend its reasoning to the search of the digital contents on a cell phone. 573 U.S. 373 (2014). The Court articulated a guiding principle, requiring an assessment of "on the one hand, the degree to which [the warrantless search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 385 (citation omitted). The Court did not abandon *Robinson*'s rule but rather asked whether applying "the search incident to arrest doctrine to [a] particular category of effects would 'untether the rule from the justifications underlying the *Chimel* exception.'" *Id.* at 386 (quoting *Arizona v. Gant*, 556 U.S. 332, 343 (2009). In answer, the Court maintained that a mechanical application of "*Robinson*'s

6

categorical rule strikes the appropriate balance in the context of physical objects," but with respect to searches of digital data stored on a cell phone, the state's interests—preventing harm to officers and the destruction of evidence—did not outweigh the considerable risks to privacy rights. *Id.* at 386.

Mr. Griffin sees in this holding an opportunity to carve out an additional limitation to *Robinson*'s categorical rule, arguing that like the digital contents of a cell phone, an arrestee's "papers are uniquely private" and are specifically protected under the Fourth Amendment. Def.'s Mem. in Supp. of Mot. to Dismiss 2, ECF No. 20 (hereafter "Def.'s Mem.") (citing U.S. const. amend. IV ("The right of the people to be secure in their persons, houses, *papers*, and effects, against unreasonable searches and seizures, shall not be violated." (emphasis added)). *Riley* does caution that just because "an arrestee has diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely" and "[n]ot every search 'is acceptable solely because a person is in custody.'" 573 U.S. at 392 (quoting *Maryland v. King*, 569 U.S. 435, 463 (2013)). Rather, "when privacy-related concerns are weighty enough a search may require a warrant notwithstanding the diminished expectations of privacy of the arrestee." *Id.* (quotation marks and citation omitted). Mr. Griffin argues that the note in his pocket, a single folded piece of paper, presents just such a weighty concern. But his attempt to establish a generalized protection for "papers" does not point to any case law that would authorize carving out this additional exception to the categorical rule.

Relevant case law on the question of how to approach "papers" in the context of a search incident to arrest is admittedly rather thin. The Second Circuit has not yet addressed this issue. Mr. Griffin argues that the Second Circuit has provided special protections for "papers" in the context of a consent search of a vehicle, where the investigating officer found and opened an envelope,

7

reading the letter inside. *Winfield v. Trottier*, 710 F.3d 49, 55−56 (2d Cir. 2013)). There the court found that the driver's consent did not extend to sealed mail found in the vehicle. A consent search of a vehicle, however, involves a selective waiver of Fourth Amendment rights, a framework quite distinct from the categorical intrusion authorized by virtue of an individual's arrest. Even granting that the court's analysis of the envelope in *Winfield* suggests a heightened privacy interest in mail, it is not clear from that case, or any other, that the court would ascribe the same heightened interest to a folded piece of paper that it does to sealed pieces of mail. Indeed, as Mr. Griffin acknowledges, those circuits that have reviewed searches with similar circumstances to those of Mr. Griffin have authorized the reading of papers seized incident to arrest. Def.'s Mem. 5 n.2 (citing *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1223–24 (11th Cir. 1993) (allowing that police may read scraps of paper in wallet and address book); *United States v. Molinaro*, 877 F.2d 1341, 1346–47 (7th Cir. 1989) (upholding reading scraps of paper found in wallet under *Robinson*); *United States v. McFarland*, 633 F.2d 427, 429 (5th Cir. 1980) (authorizing police to read papers found in defendant's shirt pocket incident to arrest under *Robinson*)). Setting aside those out-of-circuit cases, which do not control here, *Riley* provides the clearest articulation of the current framework governing searches of an arrestee's person incident to arrest. That framework does not support Mr. Griffin's argument.

In *Riley*, the Court flatly rejected the government's argument that "a search of all data stored on a cell phone is 'materially indistinguishable' from searches" of physical items that lower courts have approved. *Id.* at 393; *see, e.g.*, *United States v. Carrion*, 809 F.2d 1120, 1123, 1128 (5th Cir. 1987) (billfold and address book); *United States v. Watson*, 669 F.2d 1374, 1383–1384 (11th Cir. 1982) (wallet); *United States v. Lee*, 501 F.2d 890, 892 (D.C. Cir. 1974) (purse). As noted, the Court left in place *Robinson*'s categorical rule for search incident to arrest as it relates

8

to physical objects. *Riley*, 573 U.S. at 386. However, in justifying the necessity of rejecting the categorical approach and instead conducting a special balancing test in the context of digital data, the Court determined that "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of [physical items such as] a cigarette pack, a wallet, or a purse." *Id.* at 393. The Court highlighted distinguishing characteristics of the cellphone, including its multiple functions as a "microcomputer[]" and its immense storage capacity, which enables the collection of many distinct types of information that convey "much more in combination than any isolated record." *Id.* at 393−94. By way of example, the Court explicitly contrasts the information that might be contained on "a slip of paper" with the immense amount of communication that a cell phone can contain. *Id.* at 394−95. The Court notes that during a pre-digital era, a search could have turned up "a photograph or two" or "a paper bank statement in a pocket," again distinguishing those as physical objects that may be lawfully seized and searched incident to arrest. *Id.*

      Mr. Griffin contends that *Riley* leaves open the question of "whether reading papers—which often contain a person's most intimate thoughts and feelings" might exceed the scope of a search incident to arrest. Def's Reply Mem. in Supp. of Mot. to Dismiss 2, ECF No. 23 (hereafter "Def.'s Reply Mem."). But *Riley* only speaks dispositively to the heightened privacy interests implicated by cell phones. And it does so by carefully delineating the immense amounts and types of data contained on a cell phone, in explicit contrast to "a slip of paper." Mr. Griffin has not demonstrated that the inherently private nature of "papers" authorizes me to depart from *Robinson*'s categorical rule, and in any event, the note in this case does not present a heightened privacy interest that outweighs the legitimate government interests set forth in our Fourth Amendment jurisprudence. The motion to suppress the note is denied.

## II. Statements Made During Interrogation

Mr. Griffin also seeks to suppress statements he made to police officers during a custodial interrogation, arguing that the officers ignored his plain invocations of his right to remain silent and his right to counsel, in violation of the Fifth Amendment.

*Miranda v. Arizona* stipulates a warning that must be given to suspects before they can be subjected to custodial interrogation. 384 U.S. 436, 479 (1966). "[T]he accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [*Miranda*] rights when making the statement." *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (second alteration in original)). The burden to demonstrate such waiver rests with the government. *United States v. Lynch*, 92 F.3d 62, 65 (2d Cir. 1996). Aside from voluntary waiver, defendant may also "unambiguously invoke [their] rights and thereby cut off further questioning." *Plugh*, 648 F.3d at 125.

The parties do not dispute that the officers' interview of Mr. Griffin constituted a custodial interrogation and thus required issuance of a *Miranda* warning, that the warning given in this case complied with *Miranda*'s requirements, and that Mr. Griffin did not waive his rights. The disagreement then is whether Mr. Griffin unequivocally invoked his rights to remain silent and to counsel. I find that he invoked both rights and that the statements he made after invoking his right to remain silent should be suppressed.

### A. Right to Remain Silent

Once the *Miranda* warnings have been issued, the defendant must specifically indicate that he wishes to remain silent in order to invoke that right. *See Berghuis*, 560 U.S. at 381−82; *Plugh*, 648 F.3d at 123−24. "If the individual indicates in any manner, at any time prior to or during

questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473−74; *Berghuis*, 560 U.S. at 387−88. The invocation "must be construed liberally," *Bradley v. Meachum*, 918 F.2d 338, 342 (2d Cir. 1990), and the individual need not use "talismanic phrases or any special combination of words." *United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir. 1996). However, his invocation of the right to remain silent must be unambiguous and unequivocal. *See Berghuis*, 560 U.S. at 381−82; *Plugh*, 648 F.3d at 123−24. I must examine "the entire context in which the claimant spoke to determine if the right to remain silent has been invoked." *Bradley*, 918 F.2d at 342 (citation and internal quotation marks omitted).

Mr. Griffin argues that he made clear from the outset of the interview, prior to the reading of the *Miranda* warnings, that he did not wish to speak with the officers, as when he responded to questions about the bank robberies saying, "I'm not talking about something other than I thought." Def.'s Mem. 5−6 (quoting Ex. B 09:14−10:20). He maintains that he specifically invoked his right to remain silent—after Detective Parks read the *Miranda* warnings—by stating, "I don't have anything to say." *Id.* 6 (quoting Ex. B. 11:15−11:20). He contends that Detective Parks read the *Miranda* warnings while communicating the presumption that the interrogation would resume and thus undermined Mr. Griffin's ability to choose whether to continue talking or not. *Id.*

The government argues that Mr. Griffin's statement, "I don't have anything to say," was neither unambiguous nor unequivocal, and that Mr. Griffin was specifically referencing Detective Parks' inquiry about the four bank robberies rather than clearly indicating that he wished to cease speaking with detectives altogether. Government's Resp. Mem. in Opp'n to Mot. to Dismiss 13, ECF No. 22 (hereafter "Resp. Mem."). I do not agree. Particularly in light of the entire context of the interrogation, Mr. Griffin's assertion—"I don't have anything to say"—is sufficiently analogous to statements the Supreme Court has held cut off questioning. *See Berghuis*, 560 U.S.

11

at 382 (holding that had the claimant stated "that he wanted to remain silent or that he did not want to talk to the police" he would have invoked his right to remain silent). In *Berghuis*, the claimant unsuccessfully argued that he had invoked his right "by not saying anything for a sufficient period of time." *Id.* at 381. Mr. Griffin did not selectively remain silent but rather explicitly informed the detectives that he did not wish to speak. *Cf. Ramirez*, 79 F.3d at 305 (holding that an individual does not invoke the right to remain silent by answering some questions and remaining silent in response to others). Mr. Griffin indicated he did not wish to speak, invoking his right to remain silent, and the interrogation should have ceased immediately, rather than resuming without pause. *See Michigan v. Mosely*, 423 U.S. 96, 102 (1975) ("To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned.").

Mr. Griffin's statements made following his explicit invocation of his right to remain silent are suppressed.

### B. Right to Counsel

Having determined that Mr. Griffin did in fact invoke his right to remain silent and that all statements made subsequent to that invocation must be suppressed, I turn briefly to Mr. Griffin's second argument regarding his invocation of the right to counsel, because here, too, I find that the detectives disregarded Mr. Griffin's explicit invocation of his rights.

As with an invocation of the right to remain silent, "an accused, . . . having expressed his desire to deal with the police only though counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484−85 (1981). The government asserts that Mr. Griffin did not articulate his desire to

12

have counsel present with sufficient clarity for the officers to understand the request. Resp. Mem. 15 (citing *United States v. Medunjanin*, 752 F.3d 576, 587 (2d Cir. 2014)). But the government's argument relies far too heavily on linguistic contortions, missing the import of the underlying rule.

Mr. Griffin clearly said, "Let me talk to a lawyer." The rhetorical question he uttered immediately after—"How about that?"—does not undo the definitive statement that preceded it. The government maintains that Mr. Griffin's statement was ambiguous, and that Detective Parks' response—replying to Mr. Griffin's request with questions asking for clarification—only serves to demonstrate that lack of clarity. Were I to agree with that reasoning, such a holding would serve to incentivize intentional confusion from law enforcement in the face of a clear invocation of fundamental rights. Here, there is no question, based on my viewing of the video recording of the custodial interrogation, that Mr. Griffin clearly invoked his right to counsel, and that even absent his earlier invocation to the right to remain silent, all statements subsequent to his request for a lawyer should be suppressed.

## CONCLUSION

For the foregoing reasons, I deny Mr. Griffin's motion to suppress the written note recovered from his pocket at the time of his arrest and grant his motion to suppress statements made to law enforcement following his invocation of his right to remain silent.

SO ORDERED.

                                                   /s/
                                                   Allyne R. Ross
                                                   United States District Judge

Dated:        October 12, 2022
               Brooklyn, New York